Mr. Daly. Good morning, Your Honors. May it please the Court, I'm Joseph Daly for the Appellant Pension Fund and the Securities Fraud Class Action. I'm going to watch my time reserving three minutes for rebuttal. For the Court's de novo consideration this morning, I'd like to address two main issues. The defendant's misleading statements and omissions and second, the scienter associated with them. Now those misleading statements and omissions concerned Zendesk's data security practices, and they appeared in the company's February 14, 2019 10-K, where the defendant said, quote, we maintain a comprehensive security program to help safeguard the security and integrity of our customers' data, end quote. We also have implemented regular third-party security audits. Also in that 10-K, defendant said we have implemented, quote, the highest possible standards for protecting PII, end quote, personally identifiable information of their customers. And we've also implemented binding corporate rules, which require us to adhere to our own policies. Now the company's website gave weight to those statements with even more reassurances. The website said that Zendesk used, quote, enterprise class security features, end quote, and had implemented security best practices that went above and beyond industry standards, meeting, quote, the most stringent requirements, end quote. Now those form 10-K statements were false or misleading because they gave reasonable investors the impression of a state of affairs that differed materially from the reality inside Zendesk. Instead of adhering to the highest possible standards, or instead of having a comprehensive security program in place, Zendesk instead had fairly recently shared AWS access keys with a third-party vendor, had failed to utilize standard best practices in the industry, like multi-factor authentication and frequent access and login monitoring. Each of those actions, or inactions as it were, violated Zendesk's own recommendations to his customers, as well as contradicted the data security advice that I clarified some of the timing because the timing issues were a bit confusing to me. So, the breach, as I understand it, was in 2016. Is that right? That's correct, Your Honor. In the latter part of 2016. And then, according to the briefing between 2016 and 2019, Zendesk implemented additional or new security procedures. Is that correct? That is correct. They implemented those security procedures after the breach in late 2016, going into 2017. But at the time... And then these statements were made, that you were reading from, were made in 2019. That's correct. And that was after they had procedures and before they found out about the breach. Is that correct? That is correct, Your Honor. You've put your finger on the very issue identified by the district court, which spurred the district court's ruling. And that is, the district court thought that at the moment they made the statements, now those upgraded security procedures were in place. And therefore, Zendesk must have been speaking truthfully. But it wasn't speaking truthfully because it made those statements knowing that nonetheless, they had not implemented those better than best stringent security procedures in the wake of two prior breaches in 2013 and 2016. And as Zendesk itself had warned its clients and had warned investors, there may be undetected breaches lurking out there that we may not be able to discover. Well, that warning itself was the risk of that undetected breach existing had been exacerbated by Zendesk's own inaction. So I can see why those statements would be misleading if they came after, potentially misleading, after Zendesk became aware of the 2016 breach. But it doesn't appear that that is what's being alleged. Is that right? That they actually didn't find out about the 2016 breach until after they made the statement. So that's why I'm a bit confused. I understand, Your Honor. And two points in response. Very quickly, first of all, they didn't even discover the breach. Somebody else had to bring the breach's existence to their attention. But beyond that, yes, they did not know about the breach in 2016. That is not our case. If that were our case, I agree. We wouldn't even have brought the case. The case involves, though, the fact that on the heels of two prior breaches, and let me back up a second, you know, in 2000 from 2013 up through 2016, they were telling the industry the same thing that they had said during the class period. And that is that we have implemented the most stringent data security standards. And the media called them out on that. For the second of the three breaches and the 2016 breach of CEO Svein's Twitter account, the media called them out and said it was very, quote, embarrassing for this company that boasts that it implements the most stringent security devices. So in the wake of those two earlier breaches, it was extremely reckless for them to continue to speak to the state of their security in 2019, knowing full well that those earlier best practice or beyond best practice security standards had not been put into place. The defendants admitted after the class period that in 2016, Zendesk's security was in a much different place, was in a very different state. That's the exact quote. But at the same time, their assurances of having in place the most stringent security protocols were also being said. So what was it in 2016? Were they in a very different state? Were in its aftermath of the breach that they put into place multi-factor authentication and checking log on protocols, which by the way, are pretty much industry standards. That's not beyond industry standards. So which was it at the time, Your Honor? At which time are we talking about? 2016. In the statements you read about the highest possible standards, it expressly says in June it was in 2019 and it talks about in 2017 what they did. So it doesn't mention 2016 or make any statement about what was in place in 2016. As I spoke of two minutes ago, the media had pointed out in 2016, in June of 2016, when CEO's veins Twitter account was hacked, they said that Zendesk was claiming to have in place the most stringent security protocols. Then they said it again, as you pointed out in June of 2017. And that's a 2019 statement. All of those statements are in 2019, but they're referencing what they did in 2017 in that statement. And it's a constant mantra of we have in place the best security standards. They said it in 2016. They said it again in 2017. And they said it again during the class period when our clients were buying nearly three quarters of a million of their, of their stock, not knowing that lurking in the background was this data breach, which Zendesk itself had cautioned its customers could have grave consequences for the company. Their products would be seen as insecure. They would lose possibly existing or new customers. These were the sort of things that investors cared about at the time. Now, Mr. Daly, given the court statements in the alphabet securities litigation case, describing the Google statements as puffery, how are these statements different from statements that were considered puffery in the alphabet securities case? Two responses. First, thank you for bringing that because this case is not alphabet. In alphabet, the three statements that Judge Ikuda zeroed in on as being just generic puffery were that Google was committed to privacy. It was a leading company when it came to privacy and it had a robust program in place. This court said in quality systems, that context matters, that even general optimism can still be misleading depending upon the context of the statements. And what was the context here? They made these statements here in the wake of the industry and investors knowing that they had had two very embarrassing breaches of the company in the past that they claim to have in place state-of-the-art, better than industry standard security practices. So in that context, when you claim that you have the highest possible standards for protecting PII, that is a concrete measurable standard. Either you do or you don't. And I would submit to you when you don't have in place just basic security protocols such as multi-factor authentication, when you don't have in place access log in monitoring at a certain level, when you don't have that in place, you do not have industry best stringent security requirements. In context, they also said at the same time that breaches were possible and may occur, could occur. So it doesn't sound like they were making a definitive guarantee that there would be no breaches of their system or their information. No, of course not. They were not making a guarantee, but the warning itself, the warnings themselves were misleading. Those warnings were given at the same time, omitting from the warning, the fact that we don't know. Let's give them the benefit of the doubt. Let's give the defendants, for the sake of this 20 seconds here, the benefit of the doubt that they do not know that there's no multi-factor authentication in place. And they do not know that they don't have those log in security protocols in place, but not knowing that it is still reckless then to warn of the possibility of a breach, to warn of the possibility of these bad things happening when that breach was hovering in the background. And when it did occur, right, when I'm sorry, when it was disclosed in the wake of three disclosures, the very things that they warned about came to fruition. Zendesk products were perceived as insecure. The skeptical media was questioning why Zendesk hadn't detected that breach for three years. And the market, that is reasonable investors like our clients, they punished Zendesk stock price. You know, coming down to about three and a half minutes, if I may, unless the court has a further question at this point, I'd like to reserve the remainder. Yes, you may. We will hear from Ms. Wetchkin. Thank you, Your Honor. Robin Wetchkin on behalf of Zendesk and the individual defendants. The district court correctly dismissed this action. Plaintiff has failed to state a claim in light of its own key concessions and the timing of the events in this case. Zendesk told investors on October 2nd, 2019, that it had determined that a data breach had occurred three years earlier in 2016. Plaintiff concedes that Zendesk didn't know about the breach in 2016. Critically, plaintiff concedes that Zendesk didn't know about the breach when it made the five challenge statements between February and August of 2019. And let me pause for a moment on five challenge statements because we heard a lot about other statements from plaintiff's counsel, statements on the website, statements about best practices that customers should use. Those statements aren't challenged in this case. There are five statements. They're all in the 10k. Two are in the business section. Three are the risk disclosures. Those are the statements that are before the court. I think plaintiff's concessions on knowledge go most of the way toward disposing of this case on scienter grounds. Plaintiff nevertheless tries to carve out a narrow path to liability, but runs into problem after problem on the elements of falsity, scienter, and loss causation. And I'd like to take those in order. So starting with falsity, this is largely an omission case. Plaintiff can't allege that Zendesk omitted the fact of the breach, because plaintiff concedes that Zendesk didn't know about the 2016 breach. So the theory instead is that Zendesk omitted facts about conditions that enabled the breach. The first problem here comes from Zendesk's risk disclosures. It was interesting in Mr. Daley's argument. Sometimes he said several times investors didn't know XYZ and then turned around and said, but Zendesk itself said this. I mean, that's the point. Investors did know that there was a risk of breach because Zendesk made that very clear in its risk disclosures. I mean, the risk disclosures here were very frank. Zendesk said, we've discovered vulnerabilities in the past. We've expended significant resources to remedy them. And critically, vulnerabilities can remain undetected for an extended period. Zendesk disclosed the facts and the risks that plaintiff accuses it of omitting. The second problem here comes from the nature of the challenge statements. And let me break them down into the two business statements and then the three risk disclosures. There was a question about the alphabet decision in which the court applied well-established law on puffery. And I think at least the statement that Zendesk made that it had a comprehensive security system falls right into the wheelhouse of alphabet and the long history of case law that it was applying there. The statements about EU compliance also have obvious parallels in the statements which dismissal was approved in alphabet. I think really the statements here are on all fours with the relevant statements in alphabet. So then we have the risk disclosures. Now, Zendesk's position is that the risk disclosures provide the relevant context in which to read the business statements and show why those statements were materially false or misleading. Plaintiff wants to turn this on its head and say, well, the risk disclosures were themselves false or misleading. And plaintiff says the reason that they were themselves false or misleading is that what Zendesk described as contingencies had in fact already come to pass. So here's what Zendesk described as contingencies. If we have a breach, we could lose customers. We could suffer reputational damage. We could get sued by people whose data have been exposed. That didn't come about. There is no allegation in the complaint that any of those things happened. In fact, there's no allegation that even now Zendesk lost customers or was sued because of the data breach by anyone except the plaintiffs in this securities case, of course. There's a theme in plaintiff's brief. And we heard it again in the reply brief. And we heard it again in oral argument today that what Zendesk did wrong was it didn't disclose that the breach was heightened. Well, that's not a viable theory either factually or illegally. Factually, plaintiff's own allegations in their concessions, again, here is key, show the opposite. Plaintiff has alleged that Zendesk's security program improved between 2016 and 2019. It would be misleading to make the statement that plaintiff says Zendesk should have said that the risk was exacerbated. And then secondly, as a legal matter, there's never been a duty under the securities laws to quantify risk. It's not the case that a company should say, you know, one quarter, our risk of a breach is 5%. And then the next quarter, well, we made some improvements and now it's down to 2%. There's just no toehold in the law for imposing any kind of duty like that. The third falsity problem here, and this is the one that I think Judge Ikuda has already been zeroing in on and Judge Breyer was very focused on in his decision below, has to do with chronology. So the challenge statements were made in 2019. The breach occurred in 2016. The only way you can make a connection between those two and what plaintiff is doing here is saying, well, investors in 2019 would have read that statement to refer three years back to the situation in 2016. And what plaintiff has also said is, you know, this is an inference about investor expectation that poses a question of law and therefore can't appropriately be determined on the pleadings. That's wrong. And I think there's one decision that's particularly apropos here, and that's this court's decision last year in 2018. The plaintiff there had a similarly kind of idiosyncratic reading of the challenge statement. The company there made statements that it's manufacturing equipment. Excuse me, counsel. I'm hearing other people talking again. Yes, Judge. I've checked in with the courtroom technology team, Sam specifically. He's going to check this after court is over. It seems to be coming from your connection, and I'm not sure why. There's no live noise at all. It's just... If you were to mute your connection momentarily, I wonder if that would help. I will. So maybe we can proceed that. No, I'm still hearing it. Yeah, I was muted. I'm still hearing it, Judge. I've alerted them. I'm not really sure what we can do right now about it. I'm really sorry about it. All right. I'm sorry to interrupt. Ms. Boettchkin, please continue with your point. Yes, that's fine. And I assume I'll get a few more. I'll get a minute or so on the clock. They keep the clock running? Okay. Yes, you will. Okay. Thank you. Sorry to belabor that. So I was talking about the Tesla case, because the Tesla case, like this case, depended on plaintiffs adopting an idiosyncratic reading of the challenge statement. And plaintiffs there also said, this is a factual question that's not appropriate for resolution on the pleadings. And the court rejected that argument. The court said under the PSLRA, when a plaintiff advances a specialized or nuanced reading of the challenge statements that's different than what's on their face, the plaintiff has the burden to allege particularized facts that support that interpretation. The plaintiff didn't do that in Tesla, and the plaintiff hasn't done so here Now, plaintiff does have a theory about that. And this has to do with the 2013 hack of Twitter. There are two hacks that plaintiffs refer to. One is a 2013 hack of the company. One is a 2016 hack of the CEO's personal Twitter account, which I think is easily characterized as just beside the point. What happens on somebody's Twitter account on their personal device is very much distinct from enterprise level security programs. But taking the 2013 company event, that occurred at a time when the technology, the AWS technology that was the locus of the breach in 2016, wasn't even in place yet at Zendesk. To infer that investors believed in the 2013 statement that the 2019 statement referred to 2016 just doesn't really compute here. And I think we also need to understand this against the background that we're all familiar with, which is that technology changes all the time. Security technology changes and hackers technology changes as they try to exploit what they're discovering about possible security weaknesses. So I think in light of that background, reading a 2019 statement to refer back to 2016, because of what happened in 2013, really doesn't make a lot of sense. So let me turn now to Center. Under Telabs and the PSLRA, plaintiff had the burden of pleading particularized facts that create a strong, cogent, and compelling inference of that the individual defendants at Zendesk, the CEO and CFO, through whom Scienter must be shown, intended to deceive investors or were reckless in disregarding the risk that investors would be deceived. And I think when you look at this element, what's most remarkable is what isn't in the complaint. There's really no account in the complaint of the CFO. She's mentioned only once as signing the SEC filings, which doesn't establish Scienter under Zucco. We don't have a lot more for the CEO. We have his Twitter hat, which I think we can easily put to a side. We don't have confidential witness allegations as you do in some cases. We don't have insiders who can speak to what the individual defendant said or did or believed. We don't have internal incentive for fraud. We don't have really anything. And plaintiffs don't need to hit all of those categories. But if they don't hit any of them, if they don't have any facts that bear on individual state of mind, all they're left with are generalized inferences. And that's all that plaintiffs have here. They have the core operations inference, which this court said in the South Ferry versus Killinger case applies only in exceedingly rare categories of cases where the fraud is company-wide and existential. We don't have that here. We have to remember that concealment isn't of the breach. It's of the fact that certain features hadn't been in place three years ago. That's not the kind of dramatic situation or hands-on executive involvement that justifies application of the core operations inference. We have the corporate scienter theory too that plaintiffs invoke. This court has never adopted that theory. The court said in the Glazer decision that the theory might apply where challenge statements were so dramatically false that one infers that some executive at the company must have known that the market was being deceived. We don't have anything dramatically false here. Ultimately, the scienter inquiry is a holistic one under Tell Labs. That means we look at everything. And I'd like to focus again on the risk disclosures here. The risk disclosures were very frank. Investors were told that vulnerabilities, significant vulnerabilities had been discovered in the past that other that is making statements like this is not a company that is trying to deceive investors or hide risks from them. It's a company that is really showing exemplary communications with its investors about risks. I think even if we had had some of the allegations that we see in other cases about insider selling and the like, these risk disclosures would conclusively undermine any inference of scienter. In our brief, we touched on loss causation too. It's an issue the district court didn't reach. It's decided de novo. The arguments are fully developed. I'm not going to belabor them here unless the court has questions. In fact, unless the court has questions, I will leave it at that. Thank you. All right. Thank you, counsel. Mr. Daly. Thank you, your honor. Four quick points in response. I just heard counsel go outside the record and say technology changes all the time. So sauce for the goose, sauce for the gander. I've checked. Multi-factor authentication was developed in the 1990s. So it's been in place 20 years. And the company that says it takes data security above and beyond the industry didn't even bother to do that. Second, the Tesla case talks about nuanced statements. Here, the defendant says we've implemented, quote, the highest possible standards, end quote. That's not nuanced. That's plain as day. You cannot reconcile that claim with not having in place multi-factor authentication and heightened login protocols. Third, you know, Zendesk pats itself on the back for having told investors, you know, we've discovered vulnerabilities in the past. I think it's a very reasonable inference that those same investors would have expected Zendesk to dig in deeper and investigate whether there were some openings, some chinks in the system where another breach like that could occur. Zendesk did not. I heard counsel speak of, well, there's plaintiffs have conceded there's no knowledge here of the breach when it happened. That is true. But the failure to investigate the doubtful is equal to actual knowledge under this court's precedence. And so the fact that they didn't know about the breach at the time doesn't excuse them from having known about the two prior hacks, one involving three large clients, right? Tumblr, Pinterest, and Twitter. Having another hack that the tech media, I understand counsel said Mr. account hack was irrelevant and who cares if the CEO, what happens in his private life? Well, you know, two things, two quick responses. Number one, tech media at the time thought that was very relevant. All right. They said it was embarrassing, not just for Mr. Zvane, but it was embarrassing for Zendesk itself. And second, you can't tell me if a CEO, let's say that runs a fireworks factory, if, and, but he also has fireworks at his home. You mean to tell me if he has stored those fireworks too close to a heat source and they go off, he can't translate that same knowledge back into the company the next day when he comes into the warehouse full of fireworks? Of course he can. So that failure to investigate the doubtful is one of the many additions of Sientra here. We also have the core Sientra inference. Yes. The sheer importance of data security to Zendesk. Don't take my word for it. Take Zendesk. Zendesk itself said data security was quote, at its core. And that's excerpt of record 37 to 38 at paragraph 43, note 10. Not only showing that it was at its core, Zendesk itself repeatedly warned of the grave consequences of a data breach. All right. I mentioned failure to investigate the doubtful. We have post-class period admissions where Zvane goes back and says, you know what? Our security in 2016 was in a very different place than it is now. Well, knowing that and knowing that they had not put into place in 2016 until it was too late, multi-factor authentication and login protocols, it was reckless of the defendants to speak during the class period of having in place the best possible data security protections. And Ms. Gomez, the CFO, she signed those SEC filings. Yes. And by signing them, she made those statements as well. I see my time is running out, your honor. So just conclude by saying, you know, under this court's de novo review, taking the facts alleged as true and the reasonable inferences therefrom in our favor, we say that we have pleaded a valid securities fraud claim. Thank you. Okay. Thank you very much, counsel. This case will be submitted in a session of the court. It's adjourned for today. Thank you very much. This court for this session stands adjourned.
judges: WARDLAW, IKUTA, BADE